Brian T. Kiolbasa, OSB No. 112890
kiolbasab@lanepowell.com
**LANE POWELL PC**
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
Telephone:  503.778.2100
Facsimile:  503.778.2200

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| SCI COLLABORATION, LLC, a Florida limited liability company, NIKKI BUZZETTA and KEN LUNA,<br><br>                               Plaintiffs,<br><br>     v.<br><br>SPORTS CAR INTERNATIONAL, LLC, an Oregon limited liability company, and JOHN MICHIAL SHUMATE,<br><br>                               Defendant. | Case No. 3:20-cv-00170-AC<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT** |

Plaintiffs SCI Collaboration, LLC, Nikki Buzzetta, and Ken Luna (collectively "plaintiffs") file this First Amended Complaint against defendants Sports Car International, LLC, and John Michial Shumate (collectively, "defendants"), and allege as follows:

## PARTIES

1.      Plaintiff SCI Collaboration, LLC ("SCI Collaboration") is a Florida limited liability company.  None of SCI Collaboration's members are residents of Oregon.

2.      Plaintiff Nikki Buzzetta is a member of SCI Collaboration, and is a resident of Florida.

PAGE 1 –      PLAINTIFFS' FIRST AMENDED COMPLAINT

3.      Plaintiff Ken Luna is a member of SCI Collaboration, and is a resident of Texas.

4.      Defendant Sports Car International, LLC ("SC International") is an Oregon limited liability company.  On information and belief, all of SC International's members are residents of Oregon.

5.      Defendant John Michial Shumate ("Shumate") is a member of SC International, and is a resident of Oregon.

## JURISDICTION & VENUE

6.      This Court has original jurisdiction under 28 U.S.C. § 1332(a), as each plaintiff is a resident of a different state than each defendant, and the matter in controversy exceeds $75,000.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), because defendants reside in this judicial district, and under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATEMENT OF FACTS

8.      In early 2019, plaintiffs were approached by Shumate, who represented that he personally had identified and secured the right to purchase certain vehicles being held by authorities in the Middle East.  Shumate stated that he had identified buyers for the vehicles in the United States and Germany, and that he would be able to purchase, export, and sell the vehicles at a profit within a 4-5 week timeframe.  Shumate additionally touted his familiarity with the international market for exotic vehicles, stated he had the connections and personal relationships necessary to accomplish the transactions he described.

9.      On or about March 22, 2019, SCI Collaboration, through its members, Ms. Buzzetta and Mr. Luna, entered into a Joint Collaboration Agreement with SC International, acting through one of its members, Shumate.  A true copy of the Joint Collaboration Agreement is attached hereto as **Exhibit 1**.

10.     Under the Joint Collaboration Agreement, among other terms, SC International was tasked with identifying and inspecting vehicles located in the Middle East, purchasing the vehicles, marketing them to prospective buyers, and transporting the vehicles to buyers for profit.  SCI

LANE POWELL PC
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 Fax: 503.778.2200

Collaboration agreed to provide funding to SC International in return for a share of the expected profits.

11.    SC International represented that it had "the necessary contacts, expertise, diligence, and skills, coupled with practical experience and professional quality consistent with internationally accepted industry standards, and [the] relationships necessary" to effectuate the parties' agreement.

12.    Thereafter, pursuant to the Joint Collaboration Agreement, SCI Collaboration deposited $1,000,000 into SC International's bank account.

13.    Later in 2019, disagreements arose concerning SC International's performance of its obligations under the Joint Collaboration Agreement.  After several delays and excuses by defendants, plaintiffs questioned Shumate why the transactions he stated would take 4-5 weeks had not been completed.  Plaintiffs requested an update on defendants' operations, including an explanation of how the $1,000,000 provided by SCI Collaboration was used.  In response, Shumate reported that the funds had been deposited with authorities in Saudi Arabia, purportedly as security for vehicles that defendants had identified and held for purchase.

14.    Following more delays, plaintiffs requested additional updates from defendants.  In approximately July 2019, Shumate provided plaintiffs with a document purporting to be SC International's "Sales and Purchasing Contract."  The Sales and Purchasing Contract contained several vehicle identification numbers (VINs), which Shumate represented were vehicles that SC International had purchased and were held as inventory for prospective purchasers.

15.    Defendants' inaction led plaintiffs to locate their own buyer for at least one vehicle. When Shumate was contacted by plaintiffs to arrange for the purchase, Shumate made additional excuses why the transaction could not be completed, including by alleging that Saudi Arabia was "shut down" following terror attacks, and that political unrest made completing the sale impossible.

16.    In or about July 2019, SC International repaid $250,000 of SCI Collaboration's $1,000,000 deposit as a show of "good faith."  However, the parties continued to disagree

LANE POWELL PC
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 Fax: 503.778.2200

regarding SC International's performance, defendants' retention of the balance of the funds, and the legitimacy of defendants' business dealings.

17.    In approximately October 2019, an associate of plaintiffs traveled to Saudi Arabia to investigate defendants' representations.  Plaintiffs learned for the first time that the $1,000,000 provided to defendants was never deposited with Saudi authorities, and that the VINs noted on the Sales and Purchasing Contract provided to them by Shumate in July 2019 belonged to vehicles that had been sold and exported from Saudi Arabia in May 2019.

18.    Plaintiffs then confronted Shumate regarding defendants' misuse of funds provided by SCI Collaboration.  When presented with plaintiffs' newly acquired information, Shumate admitted that he had not performed as required under the Joint Collaboration Agreement, and confessed to lying about his use of the $1,000,000 provided by plaintiffs.  Shumate stated that he "didn't want trouble," that that he would return the outstanding sum of $750,000 to plaintiffs.

19.    On or about December 30, 2019, the parties entered into a Termination and Release Agreement, a copy of which is attached hereto as **Exhibit 2**.  Among other terms, the parties agreed to terminate the Joint Collaboration Agreement, and SC International agreed to pay the sum of $750,000 to plaintiffs.  In return, defendants would receive releases by plaintiffs of any claims against SC International or Shumate personally.

20.    During negotiations of the Termination and Release Agreement, Shumate represented to plaintiffs that SC International was able to pay the $750,000 it owed, and further proposed that SC International would do so within 15 business days of December 30, 2019.

21.    Accounting for weekends and federal holidays, SC International's payment was due not later than January 23, 2020.  No payment has been received by SCI Collaboration.

22.    SC International has failed and refused to pay the $750,000 sum due under the Termination and Release Agreement, and therefore has breached its terms.  As a result of SC International's breach, defendants are not entitled to the benefit of the releases called for in the Termination and Release Agreement.

PAGE 4 –      PLAINTIFFS' FIRST AMENDED COMPLAINT

**FIRST CLAIM FOR RELIEF**

**(Breach of Contract – SC International)**

23.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-22 as though fully set forth herein.

24.    Under the Joint Collaboration Agreement, SC International agreed to faithfully and diligently perform its obligations to fulfil the parties' stated intent to acquire, export, and resell vehicles at a profit.

25.    SC International has failed to perform its obligations under the Joint Collaboration Agreement.

26.    Pursuant to the Joint Collaboration Agreement, SC International's failure to perform constituted a breach that immediately terminated the parties' relationship.

27.    As a result of SC International's breach, plaintiffs are entitled to recover damages under the contract, including but not limited to $750,000 that remains outstanding and unaccounted for, and plaintiffs' costs and attorney fees pursuant to Article 7.1 of the Joint Collaboration Agreement.

**SECOND CLAIM FOR RELIEF**

**(Breach of Duty of Good Faith and Fair Dealing – SC International)**

28.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-27 as though fully set forth herein.

29.    Oregon law recognizes the implied obligation of good faith and fair dealing in all contracts.  In general, the duty requires that parties to a contract not act in a way that destroys or injures the rights of the other, or that frustrates or defeats the object of the contract.

30.    SC International's actions, including those made by and through its member, Shumate, violated the duty of good faith and fair dealing owed to plaintiffs.

31.    Shumate engaged in improper conduct in his exercise of control over SC International, by (a) grossly undercapitalizing the entity, causing it to be unable to satisfy its obligations; (b) misrepresenting to plaintiffs the nature of SC International's experience, abilities,

PAGE 5 –      PLAINTIFFS' FIRST AMENDED COMPLAINT

and qualifications; (c) misrepresenting to plaintiffs the status and use of the $1,000,000 provided to SC International by plaintiffs; (d) misrepresenting to plaintiffs the nature of SC International's operations, including but not limited to the entity's activities and efforts to perform the Joint Collaboration Agreement when confronted; (e) misrepresenting to plaintiffs SC International's ability to repay its debts; (f) commingling SC International's affairs and finances with that of non-parties; and (g) transferring the assets of SC International to Shumate and/or other non-parties.

32.     As a result of SC International's breach, plaintiffs are entitled to recover damages under the contract, including but not limited to $750,000 that remains outstanding and unaccounted for, and plaintiffs' costs and attorney fees pursuant to Article 7.1 of the Joint Collaboration Agreement.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract/Veil Piercing – John Michial Shumate)

33.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-32 as though fully set forth herein.

34.     At all material times, Shumate exercised actual control of SC International, or at minimum, shared in the control of SC International, by running its day-to-day operations, having actual authority to conduct its business, having access to its finances, and assuming other roles and duties.

35.     Shumate engaged in improper conduct in his exercise of control over SC International, by (a) grossly undercapitalizing the entity, causing it to be unable to satisfy its obligations; (b) misrepresenting to plaintiffs the nature of SC International's experience, abilities, and qualifications; (c) misrepresenting to plaintiffs the status and use of the $1,000,000 provided to SC International by plaintiffs; (d) misrepresenting to plaintiffs the nature of SC International's operations, including but not limited to the entity's activities and efforts to perform the Joint Collaboration Agreement when confronted; (e) misrepresenting to plaintiffs SC International's ability to repay its debts; (f) commingling SC International's affairs and finances with that of non-parties; and (g) transferring the assets of SC International to himself and/or other non-parties.

LANE POWELL PC
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 Fax: 503.778.2200

36.    Shumate's actions have interfered with SC International's performance and its ability to perform its obligations owed to plaintiffs.

37.    Additionally, Shumate's actions have eliminated plaintiffs' ability to recover from SC International.    Defendants have represented that SC International is unable to repay the $750,000 owed to SCI Collaboration.    The Oregon Secretary of State has administratively dissolved SC International.[1]    On information and belief, SC International has ceased operations, is no longer operating as a going concern, and is judgment-proof.    Accordingly, plaintiffs are without an adequate remedy to recover against SC International.

38.    As a result of Shumate's actions and conduct, he is not entitled to the protections of Oregon's LLC statutes.    Accordingly, the corporate veil must be pierced, and Shumate held personally liable for SC International's debts, including but not limited to $750,000 that remains outstanding and unaccounted for, and plaintiffs' costs and attorney fees pursuant to Article 7.1 of the Joint Collaboration Agreement.

## FOURTH CLAIM FOR RELIEF

### (Fraudulent Misrepresentation – John Michial Shumate)

39.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-38 as though fully set forth herein.

40.    Shumate approached plaintiffs in early 2019 and represented that he had international contacts in the automotive field that would allow him to purchase vehicles in the Middle East for a small percentage of their value, then export them to the United States to be sold at a significant profit.    According to Shumate, the only thing he lacked was access to sufficient funds that would permit him to acquire the first lot of vehicles, after which time he could expand

---

[1] *See* Oregon Secretary of State records for Sports Car International, LLC, *available at* http://egov.sos.state.or.us/br/pkg_web_name_srch_inq.show_detl?p_be_rsn=1506900&p_srce=BR_INQ&p_print=FALSE (last visited November 30, 2020) (indicating administrative dissolution of SC International on May 14, 2020).

PAGE 7 –    PLAINTIFFS' FIRST AMENDED COMPLAINT

LANE POWELL PC
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 Fax: 503.778.2200

719319.0001/8257646.1

his operation and repeat the process he described. Shumate stated that he had buyers arranged for the vehicles, and that the first lot of vehicles could be "flipped" in 4-5 weeks.

41.     Based on Shumate's representations, plaintiffs agreed to partner with Shumate through the individuals' respective business entities to provide the required funding. The parties' agreement ultimately resulted in the Joint Collaboration Agreement.

42.     The Joint Collaboration Agreement called for plaintiffs to provide defendants with initial funding in the amount of $1,000,000. According to Shumate, the funds would be used as a deposit to secure the first lot of vehicles for purchase and export to buyers in the United States and Germany.

43.     Shumate represented that the funds would be used to further the parties' partnership, when in fact, he knew that the funds would not be used for that purpose.

44.     Based on Shumate's representations, on which he intended plaintiffs rely, plaintiffs caused $1,000,000 to be deposited in SC International's bank account.

45.     Unbeknownst to plaintiffs, Shumate diverted, concealed, or otherwise misused the funds provided by plaintiffs for purposes other than furthering the parties' joint enterprise.

46.     Had plaintiffs been aware of Shumate's true intentions, they would not have entered into the Joint Collaboration Agreement, and would not have provided $1,000,000 in funding to defendants.

47.     Plaintiffs were damaged by Shumate's fraudulent misrepresentations at an amount to be proven at trial, including but not limited to $750,000 that remains outstanding and unaccounted for, and plaintiffs' costs and attorney fees pursuant to Article 7.1 of the Joint Collaboration Agreement.

48.     Plaintiffs further seek punitive damages, as Shumate's fraudulent conduct was made with malice (or alternatively with a reckless and outrageous indifference to a highly unreasonable risk of harm), and such actions were taken with a conscious indifference to the health, safety and welfare of plaintiffs. As a result, plaintiffs are entitled to recover punitive damages

LANE POWELL PC
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 Fax: 503.778.2200

against Shumate in the amount of $1,000,000, to deter such acts and conduct by Shumate in the future.

## FIFTH CLAIM FOR RELIEF

### (Fraudulent Misrepresentation – John Michial Shumate)

49.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-48 as though fully set forth herein.

50.    In late 2019, the parties began negotiations in an effort to resolve their dispute regarding SC International's performance and Shumate's conduct.  Ultimately, defendants agreed that SC International would pay $750,000 to plaintiffs within 15 business days of December 30, 2019, as reflected in the Termination and Release Agreement.

51.    Time was of the essence to plaintiffs, as defendants' actions had established a high level of distrust, and because $750,000 of plaintiffs' $1,000,000 funding remained outstanding and unaccounted for.

52.    During the course of negotiations, Shumate represented that SC International had the ability to pay the $750,000 to plaintiffs within 15 business days of December 30, 2019. Shumate made this statement in order to induce plaintiffs to execute the Termination and Release Agreement, so that he could obtain the benefit of the agreement's release provision that would presumably insulate him from any claims plaintiffs had relating to his conduct.

53.    Shumate's representation that SC International had the ability to pay was made without the intent that the funds would actually be paid, or alternatively, with reckless disregard for whether SC International could actually make the payment.

54.    Plaintiffs reasonably relied on Shumate's representation with no knowledge of its falsity.  Had plaintiffs known of SC International's inability to pay, they would not have agreed to the Termination and Release Agreement, and would have pursued other avenues of relief.

55.    Plaintiffs were damaged by Shumate's representation at an amount to be proven at trial, including but not limited to their loss of use of funds and expenses incurred in pursuing defendants and attempting to gain defendants' compliance with their contractual obligations.

LANE POWELL PC
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 Fax: 503.778.2200

## **PRAYER FOR RELIEF**

Based on the foregoing, plaintiffs pray for a judgment against defendants, jointly and severally, as follows:

a.      The principal amount of $750,000;

b.      Prejudgment interest at the statutory rate on the above sum from January 23, 2020, until the date judgment is entered;

c.      Post-judgment interest at the statutory rate from the date judgment is entered until paid;

d.      Punitive damages of $1,000,000 against John Michial Shumate, only, in his individual capacity;

e.      All other direct, incidental, and other damages as may be proven at trial;

f.      An award of plaintiffs' costs and attorney fees, pursuant to the terms of the Joint Collaboration Agreement;

g.      For such further relief as the Court deems just; and

h.      For leave to amend this Complaint to supplement or allege new causes of action or additional defendants.

## **JURY DEMAND**

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38.

DATED:  November 30, 2020

                    LANE POWELL PC


                    By:   s/ Brian T. Kiolbasa
                          Brian T. Kiolbasa, OSB No. 112890
                          Telephone:  503.778.2100
                          Attorneys for Plaintiffs

PAGE 10 –    PLAINTIFFS' FIRST AMENDED COMPLAINT

LANE POWELL PC
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 Fax: 503.778.2200

719319.0001/8257646.1

## JOINT COLLABORATION AGREEMENT

This Joint Collaboration Agreement ("Agreement") is made and entered into this 22nd day of March 2019 by and between:

(1)   **M/s Sports Car International LLC,** a Limited Liability Company duly incorporated in Portland, Oregon, USA with mailing address at 29030 SW Town Center Loop Suite 202 #527, Wilsonville, Oregon, 97070 USA, Telephone No: 1+ (503) 360-7467, and for the purpose of signing this Agreement is duly represented by Mr. John Michial Shumate.

   (Hereinafter referred to as the **"First Party"**)

Florida

(2)   **M/s SCI Collaboration, LLC,** a Limited Liability Company duly incorporated in Houston, Texas, USA with mailing address at PO Box 56192, Houston, TX 77256 USA, Telephone No: 1+(480) 388-5525, and for the purpose of signing this Agreement is duly represented by Ms. Nicole Buzzetta and Mr. Ken Luna..

   (Hereinafter referred to as the **"Second Party"**)

(**"First Party"** and **"Second Party"** shall jointly be referred to hereinafter as the "**Parties**" and individually as "**Party**")

**Preamble**:

**WHEREAS**

   (1)   The First Party is an establishment based in Portland, Oregon, USA in the business of Automotive Sales; and

   (2)   The First Party is business partners with Ante Meridien Private, Dubai and AM International Group, London; and

   (3)   The First Party approached the Second Party offering, undertaking and warranting that they have the necessary contacts, expertise, diligence, and skills, coupled with practical experience and professional quality consistent with internationally accepted industry standards, and relationships necessary, subject to the terms and conditions of this Agreement; and

   (4)   The Second Party assigns the task of purchasing Vehicles from the designated markets (Kingdom of Saudi Arabia, State of Qatar, the United Arab Emirates and other countries in the Middle East) to the First Party on behalf of the Parties; and

   (5)   The Second Party has the Banking relationships necessary to secure funding, subject to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants contained herein, the Parties hereby agree as follows:

**Article (1)**
**Recital**

The foregoing Preamble shall form an integral part of this Agreement.

**Article (2)**
**Obligations, covenants and scope of work of the First Party**

2.1 The First Party warrants and undertakes as follows:

Exhibit 1 - Page 1

2.1.1    Utilise its best endeavours to secure a Line of Credit, through the use of the Second Parties Standby Letter of Credit, to purchase Vehicles in State of Qatar, Kingdom of Saudi Arabia, United Arab Emirates and other countries in the region.

2.1.2    Sources the Vehicles to be sold.

2.1.3    Verifies the Vehicle Identification Number and Equipment.

2.1.4    Completes Vehicle Inspection including Photos.

2.1.5    Prepares Valuation Reports.

2.1.6    Verifies Ownership Documentation and Vehicle History.

2.1.7    Approves Units for Purchase.

2.1.8    Prepares and Finalizes Sales and Purchase Contracts.

2.1.9    Makes arrangement with Export Agent to handle; Inspection, Verification, Export Customs and Release of Payments.

2.1.10   Makes arrangements for Shipping and Insurance.

2.1.11   Provides a State of Oregon, USA Title, as applicable.

2.1.12   Makes arrangements for Import Customs and Certification, as applicable.

2.1.13   Delivers all Sales Documentation and a Disbursement Statement for each Vehicle sale, including Profit Percentages to the Parties and reimbursement of Purchase Costs to the Line of Credit.

2.1.14   Any Travel or other Expenses, outside of direct purchase expenses, of the First Party are to be paid directly or offset through its consideration as defined in section 6.1.2.

### Article (3)
### Restrictions of the First Party

3.1  The First Party shall not:

3.1.1   Accept any orders, sign any contract or agreements on behalf of the other Parties and will not make any promises, representations, warranties or guarantees other than subject to written confirmation and acceptance of the other Parties.

3.1.2   Engage in any prejudicial conduct or to cause a conflict of interest between itself and the other Parties; or to do anything that may prevent the distribution of the Vehicles from Middle East.

### Article (4)
### Obligations, covenants and scope of work of the Second Party

4.1  The Second Party warrants and undertakes as follows:

4.1.1 To provide a minimum of Five Million US Dollars ($5,000,000) in Funding, through a combination of Deposit and/or by providing a Standby Letter of Credit, up to a maximum of Fifty Million US Dollars ($50,000,000).

4.1.2 To make a Deposit to the First Party's Bank Account of an initial minimum amount of One Million US Dollars ($1,000,000 USD).

Exhibit 1 - Page 2

4.1.2.1 Deposit to be made to the following Account:

> By Domestic Wire
> Sports Car International, LLC
> Chase Bank N.A.
> 270 Park Ave.
> New York, NY 10017
> Account #: 299925518
> Routing #: 021000021
>
> By Direct Deposit
> Sports Car International, LLC
> Deposit to Checking
> Account #: 299925518
> Routing #: 32507060

4.1.3 Utilise its best endeavours to make use of their existing Banking relationships with JP Morgan Chase to provide a Standby Letter of Credit, with a term of One (1) Year, of an initial amount of Five Million US Dollars ($5,000,0000 USD) up to a maximum amount of Fifty Million US Dollars ($50,000,000 USD).

4.1.4 Standby Letter of Credit to make use of Message Form MT760 as required for the First Party's Bank to secure Line of Credit.

4.1.5 Act in good faith and shall not act or omit to act in any way which may be regarded as damaging to the other Parties' reputations and does not violate any applicable law, regulation, order or judicial or an administrative decision, including any such law, regulation, order or judicial or administrative decision in USA.

## Article (5)
## Restrictions of the Second Party

5.1 The Second Party shall not:

5.1.2 Accept any orders, sign any contract or agreements on behalf of the other Parties and will not make any promises, representations, warranties or guarantees other than subject to written confirmation and acceptance of the other Parties.

5.1.3 Engage in any prejudicial conduct or to cause a conflict of interest between itself and the other Parties; or to do anything that may prevent the distribution of the Vehicles from Middle East.

## Article (6)
## Consideration

6.1 In consideration of the services to be rendered by the Parties as per this Agreement, it has been agreed herein that the Parties shall be paid a percentage of the Gross Vehicle Profit in the following manner:

6.1.1 The Gross Vehicle Profit to be defined as the Wholesale Sales Price of the Vehicle; less the Purchase Cost, Shipping and Insurance Cost, Import Certification Cost, Import Duties Cost, Documentation Fees, Agent Fees and Reconditioning Cost as per the disbursement sheet.

6.1.2 To the First Party: An amount equal to One Half (1/2) or Fifty Percent (50.00%) of the Gross Vehicle Profit.

6.1.3 To the Second Party: An amount equal to One Half (1/2) or Fifty Percent (50.00%) of the Gross Vehicle Profit.

Exhibit 1 - Page 3

6.1.4 To be paid directly at time of Vehicle Sale, by Wire Transfer to the Parties Bank Accounts', to be provided by the Parties;

**Article (7)**
**Liabilities and claims**

7.1 The Parties agree that each Party will:
    7.1.1   Indemnify and hold harmless the other Parties, their respective partners, officers, directors, agents, employees, representatives, subsidiaries and affiliates, from and against any and all liability, claims, compensation, demands, expenses, fees, fines, suits, losses of every kind (including but not limited to fees and expenses of legal counsel) arising out of or resulting from any breach or alleged breach, acts, omissions, negligence, misconduct or fraud, default by the other Parties or its employees or agents or representatives of any term, representation, warranty or covenant herein, in connection with this Agreement.

**Article (8)**
**Term of Agreement**

8.1 This agreement shall be in force for a period of Two (2) years, which shall renew automatically for an additional Two (2) year period, unless terminated by the Parties as per Article 9 of this agreement.

**Article (9)**
**Termination**

9.1 This Agreement shall continue until terminated upon mutual written Agreement of all Parties, however, this Agreement shall be terminated immediately in the following events:

    9.1.1   If First Party breaches any term or condition of this Agreement including its obligations, scope of work, covenants including without limitation to negotiate as per Article 2 of this Agreement which is not capable of remedy or, in the case of a breach which is capable of remedy, if the other Parties fails to take all reasonable steps to remedy the same within forty-five (45) days of notice given by the First Party specifying the breach and requiring the same to be remedied; or

    9.1.2   If Second Party breaches any term or condition of this Agreement including its obligations, scope of work, covenants including without limitation to negotiate as per Article 2 of this Agreement which is not capable of remedy or, in the case of a breach which is capable of remedy, if the other Parties fails to take all reasonable steps to remedy the same within forty-five (45) days of notice given by the Second Party specifying the breach and requiring the same to be remedied; or

    9.1.3   If Third Party breaches any term or condition of this Agreement including its obligations, scope of work, covenants including without limitation to negotiate as per Article 2 of this Agreement which is not capable of remedy or, in the case of a breach which is capable of remedy, if the other Parties fails to take all reasonable steps to remedy the same within forty-five (45) days of notice given by the Second Party specifying the breach and requiring the same to be remedied;

**Article (10)**
**Warranties of the Parties**

10.1 Each Party hereby warrants to the other that:

    10.1.1 That it shall faithfully and diligently perform those duties and exercise such powers consistent with them which are from time to time necessary in connection with their obligations under the terms of this Agreement.

    10.1.2 It has the necessary power and authority to enter into and perform its obligations under this Agreement.

Exhibit 1 - Page 4

10.1.3 The execution, delivery and performance by it of this Agreement has been duly authorised by all requisite corporate action and will not contravene any provision of, or constitute a default or acceleration of liability under, any other Agreement or instrument to which it is a Party or by which it or its property may be bound; and

10.1.4 This Agreement constitutes legal, valid and binding obligations on it, enforceable in accordance with its terms.

**Article (11)**
**Notices**

All the notices, approvals, requests, and instructions addressed to any Party of this Agreement shall be in writing and delivered by post, email or facsimile to the addresses stated in this Agreement.

**Article (12)**
**Confidentiality and Non-Disclosure**

Any information, or data exchanged between the Parties (whether prior to the execution of this Agreement or during its validity) directly related to this Agreement such as but not limited to; structure, wording of documents, details of pricing structure, research data, trade secrets, customers details, contact numbers, sales quantities and values are hereby considered as exclusive and confidential at all times. The Parties shall not disclose, duplicate, publish, or reveal any information to any other Party without obtaining the other Parties prior written consent. If any legal proceedings are commenced or action taken which could result in any Party, becoming required to disclose Confidential Information, the Party shall immediately notify the other Parties in writing and shall take all reasonable steps to resist or avoid such proceedings or action, including all steps that any Party may request and keep the other Parties fully and promptly informed of all related matters and developments. If Parties are obliged to disclose Confidential Information to any third Party, whether pursuant to such proceedings or action or otherwise any Party shall disclose only to that third Party and only the minimum amount of information consistent with satisfying its obligation subject to the prior written consent of the the other Parties authorized personnel who are entitled to grant such consent. The Parties shall promptly give the other Party prior written notice of Confidential Information proposed to be disclosed to any third Party and shall provide a copy of the proposed disclosure. Any Party's sources, contacts, and/or customers shall at all times be construed as proprietary, exclusive and confidential.

**Article (13)**
**Assignment**

Neither Party shall assign or transfer any rights, interests, benefits liabilities and / or obligations under this Agreement, whether in whole or in part, without the consent, in writing, of the other Parties. Except as required by Bank to secure Line of Credit.

**Article (14)**
**Entire Agreement**

This Agreement constitutes the entire understanding between the Parties with respect to the subject hereof and supersedes all previous Agreements between them on the subject. No alterations or amendments to this Agreement shall be effective unless made in writing and signed by each of the Parties.

**Article (15)**
**Governing Law and Dispute Resolution**

This Agreement shall be governed by the laws of Clackamas County, State of Oregon, United States of America. Any dispute or difference of opinion as to the interpretation of this Agreement by the Parties hereto which are not amicably settled between the Parties within 45 days, then the arbitration provisions herein shall immediately apply. In the event of any such claims or disputes over this Agreement, and as a condition precedent to the commencing of any legal action on said Agreement, the Parties do hereby agree that they will first submit said dispute to final and binding arbitration in Clackamas County, State of Oregon, United States of America. A single arbitrator shall be

Page **5** of 7



Exhibit 1 - Page 5

selected by Agreement of the Parties or, in the alternative, by the presiding judge in Clackamas County, State of Oregon, United States of America. Each Party shall be responsible for one-third (1/3) of the fees and expenses of the Arbitrator or as determined by the Arbitrator. The mandatory arbitration rules of the Clackamas County Courts, if any, shall be binding as to procedure, except as to any right of appeal which is not applicable herein. Within ten (10) days of notice of arbitration by a Party, an arbitrator shall be designated, and the hearing held within forty-five (45) days thereof, and a decision made within ten (10) days of such hearing. Judgment on the arbitrator's award or decision may be entered in any court of competent jurisdiction to enforce the arbitrator's award or decision.

Exhibit 1 - Page 6

The Parties hereto caused this Agreement to be signed by their respective Representatives on the day, month and year first hereabove mentioned.

**First Party:**

Sports Car International, LLC

John Michial Shumate

Title: Member

_____

Dated: March 22nd, 2019

**Second Party:**

SCI Collaboration, LLC

Nicole Buzzetta

Title: Member

_____

Dated: March 22nd, 2019

SCI Collaboration, LLC

Ken Luna

Title: Member

_____

Dated: March 22nd, 2019

Exhibit 1 - Page 7

## TERMINATION AND RELEASE AGREEMENT

Sports Car International LLC, an Oregon limited liability company ("SCI"), and John Michial Shumate, on the one hand (together, the "Group A Parties"); and SCI Collaboration, LLC, a Florida limited liability company ("SCIC"), Nicole Buzzetta, and Ken Luna, on the other hand (together, the "Group B Parties"), hereby enter into this Termination and Release Agreement (this "Release Agreement"), effective _December 30, 2019_

### Background

SCI and SCIC entered into a Joint Collaboration Agreement dated March 22, 2019 (the "Agreement"). Certain disagreements have arisen relating to the Agreement. In this Release Agreement, SCI and SCIC terminate the Agreement, and the Group A Parties and the Group B Parties release one another from all claims.

### Agreement

1.   <u>Termination</u>. The Agreement is hereby terminated.

2.   <u>Payment</u>. In consideration of the releases below, the termination of the Agreement above, and other valuable considerations, the sufficiency of which is hereby confessed and agreed to, SCI shall pay $750,000 to SCIC within fifteen business days after this Agreement is executed, according to the payment instructions attached as <u>Exhibit A</u>.

3.   <u>Group A Parties' Release</u>. Each Group A Party, on behalf of itself and its respective present and former parent, subsidiary, and affiliated entities, and each of their respective present and former employees, officers, directors, shareholders, members, managers, agents, representatives, heirs, successors, and assigns (collectively, "Representatives"), hereby releases, waives, and forever discharges the Group B Parties and their Representatives of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, allegations of fraud or misrepresentation, damages, judgments, extents, executions, claims, and demands of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law or equity (collectively, "Claims"), that any Group A Party (or its Representatives) ever had, now have, or later can, will, or may have against any Group B Party (or its Representatives) for, upon, or by reason of any matter, cause,

TERMINATION AND RELEASE AGREEMENT

040984/00001/10583145v4

Exhibit 2 - Page 1

or thing whatsoever from the beginning of time through the date of this Release Agreement.

4.    <u>Group B Parties' Release</u>. Each Group B Party, on behalf of itself and its Representatives, hereby releases, waives, and forever discharges the Group A Parties and their Representatives of and from any and all Claims that any Group B Party (or its Representatives) ever had, now have, or later can, will, or may have against any Group A Party (or its Representatives) for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of time through the date of this Release Agreement.

5.    <u>Unknown Claims</u>. Each Party understands that it may later discover Claims or facts that may be different from, or in addition to, those that it or any other Party now knows or believes to exist regarding the subject matter of the release above, and which, if known at the time of signing this Release Agreement, may have materially affected this Release Agreement and such Party's decision to enter into it and grant the release above. Nevertheless, each Party intends to fully, finally, and forever settle and release all Claims that now exist, may exist, or previously existed, as set forth above, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the release given above is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. Each Party hereby waives any right or Claim that might arise as a result of such different or additional Claims or facts.

6.    <u>No Admission</u>. This Agreement is a compromise of disputed claims. No Party admits any allegation or claim by signing this Release Agreement.

7.    <u>Confidentiality</u>. Each Party agrees to keep confidential and not disclose to any third party the terms and conditions of settlement and of the contents of this Release Agreement, the existence of this Release Agreement, the subject matter of this Release Agreement, and any of the negotiations and discussions that preceded the making of this Release Agreement (collectively "Confidential Matters"), except as may be necessary to perform of effectuate any term or provision of this Release Agreement or to comply with federal or state law or a subpoena of a court of competent jurisdiction. If any of the foregoing exceptions to confidentiality may be applied, the disclosing party will nevertheless use their best efforts to seek confidential treatment of the Confidential Matters by any receiving party. Each Party shall have all remedies available to it to enforce this paragraph of the agreement including, but not limited to, specific performance.

8.    <u>Other</u>. This Release Agreement will be effective only when executed by all Parties. This Release Agreement is governed by the substantive laws *of the State*

TERMINATION AND RELEASE AGREEMENT

040984/00001/10583145v4

Exhibit 2 - Page 2

of Oregon, without regard to conflicts-of-laws principles. Any dispute arising out of or relating to this Release Agreement will be resolved exclusively by the courts located in Clackamas, Oregon. This Release Agreement, and each of its terms and provisions, may be amended, modified, waived, or supplemented only by an agreement in writing signed by each Party. This Release Agreement may be executed in counterparts, each of which is deemed an original, but all of which constitute one and the same agreement. Signatures delivered electronically are effective as originals. This Release Agreement constitutes the sole and entire agreement of the Parties with respect to its subject matter and supersedes (and each Party hereby disclaims reliance upon) any and all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**GROUP A PARTIES:**

Sports Car International, LLC

By: _____

John Michial Shumate
Member

_____

John Michial Shumate
12/28/2018

**GROUP B PARTIES:**

SCI Collaboration, LLC

By: _____

Nicole Buzzetta
Member

By: _____

Ken Luna
Member

_____

Nicole Buzzetta

_____

Ken Luna

TERMINATION AND RELEASE AGREEMENT

040984/00001/10583145v4

Exhibit 2 - Page 3